**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

STEVEN G. KOENIG,

Plaintiff,

-against-

GEORGE J. SALIBA and J&S AUTOHAUS GROUP,

Defendants.

Case No. 2:26-CV-02112-DDC-RES

# FIRST AMENDED COMPLAINT

COMES NOW the plaintiff, Steven G. Koenig, by and through his counsel, and for his causes of action against defendants, George J. Saliba and J&S Autohaus Group, states and alleges as follows:

## INTRODUCTION

1. Defendants George J. Saliba and J&S AutoHaus Group (together, "Defendants") have taken what was, at most, a short-lived disagreement about the terms of a contract that was quickly resolved, and created a heavily sensationalized untrue story in the form of videos posted on the internet that have been viewed by hundreds of thousands of people. Defendants have falsely villainized plaintiff Steven G. Koenig for Defendants' own financial gain at the expense of Mr. Koenig's reputation and his privacy and the viewers have responded by posting ugly, threatening and antisemitic comments about Mr. Koenig.

2. Mr. Koenig is a successful venture capitalist whose work depends upon a bond of trust with potential investors and those who own and operate the businesses in which he in turn invests. Mr. Koenig is also a long-time collector of exotic cars. In late 2025, he sought to sell several Ferraris from his collection.

3. In December of that year, Defendants were identified to Mr. Koenig as possible buyers of Mr. Koenig's Ferraris.

4. Later in December, Mr. Koenig and Defendants reached an agreement for the sale of seven of Mr. Koenig's Ferraris. As an incentive for Defendant J&S to purchase all seven Ferraris, Mr. Koenig agreed to conduct the sale in two parts. Mr. Koenig and Defendant J&S agreed to an initial sale of six of Mr. Koenig's Ferraris that would include a $20,000 discount followed by a later sale of Mr. Koenig's seventh Ferrari that would include a $20,000 premium.

5. After some discussion, Mr. Koenig and Defendants changed the terms of the sale to include only six Ferraris. It was understood by both Mr. Koenig and Defendants that the originally contemplated $20,000 discount would no longer apply to the sale of the six Ferraris.

6. Contrary to the agreement, Defendant J&S paid Mr. Koenig an amount that was $20,000 less than the agreed purchase price. In response, Mr. Koenig declined to release the Ferraris to Defendants until Defendant J&S made the full payment in accordance with the agreement.

7. On or about December 30, 2025, Mr. Koenig and Defendants were able to work out their disagreement on a telephone call (the "December 30 Phone Call"). Defendants agreed that Defendant J&S would pay the $20,000 it owed to Mr. Koenig. Ten days later, on January 9, 2026, Mr. Koenig received the final $20,000 payment and released the six Ferraris to Defendants. This should have been the end of it—but it was not.

8. On January 21, 2026, Defendants posted a video to their YouTube channel, which Defendants use to advertise their business. The video is titled: "We Got SCAMMED $1,000,000 By a Ferrari Dealer!? | Day in the Life of a LUXURY Car Dealer" (the "Video"). The Video contains numerous false statements about Mr. Koenig, including that Mr. Koenig is a

"scammer," "crazy," and that his conduct is worthy of criminal prosecution. The Video includes excerpts from the December 30 Phone Call between Mr. Koenig and Defendant Saliba, including a recording of Mr. Koenig's voice, a mention of Mr. Koenig's first name and the name of the town where Mr. Koenig lives.

9. Mr. Koenig was horrified to discover the Video and on February 13, 2026, demanded that Defendants remove the Video from the internet. A representative of Defendants immediately said that the Video would be taken down. But, contrary to their commitment, Defendants simply replaced the original Video with an edited version that continues to defame Mr. Koenig and invade his privacy.

**PARTIES**

10. Steven G. Koenig, the plaintiff, is domiciled in Kansas. He is chief executive officer of his own venture capital firm, has served as a Professor of the Practice at the University of Kansas School of Business, and sits on several boards. He also is a long-time collector of exotic cars and is an active member of the car collecting community in and around Johnson County, Kansas.

11. Upon information and belief, Defendant George J. Saliba is domiciled in New Jersey. Defendant Saliba is the general manager and an owner of J&S AutoHaus Group (hereinafter referred to as "J&S"). In addition to his duties as general manager and owner at J&S, Defendant Saliba runs and creates content for his YouTube Channel entitled "George J. Saliba," including videos depicting his life as a used car dealer, in order to advertise Defendant J&S. Defendant Saliba also has a YouTube channel titled "The Saliba Show," where he posts content similar to that found on his George J. Saliba channel.

12. Upon information and belief, Defendant J&S is an unincorporated business whose owners/partners/members, Jean Saliba and his sons George J. Saliba and Jean Saliba II are

domiciled in New Jersey. Upon information and belief, Defendant J&S has its principal place of business at 1723 N. Olden Ave., Ewing, New Jersey 08638. Upon information and belief, Defendant J&S is not incorporated or otherwise organized in Kansas, it has no place of business in Kansas, and none of its owners/partners/members is domiciled in Kansas. J&S owns and operates four car dealerships in New Jersey that primarily sell used cars, including J and S AutoHaus Six in Mt. Holly, New Jersey; J and S AutoHaus III in Hamilton, New Jersey; J and S Mitsubishi in Ewing, New Jersey; and Exotic Auto in Ewing, New Jersey.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

14. Plaintiff is a domicile of Kansas.

15. Upon information and belief, Defendant Saliba is a domicile of New Jersey.

16. Upon information and belief, Defendant J&S is an unorganized business, with its principal place of business in New Jersey, and all its owners/partners/members are domiciled in New Jersey.

17. Complete diversity of citizenship therefore exists between plaintiff and Defendants as required by 28 U.S.C. § 1332(a)(1).

18. The amount in controversy exceeds $75,000, exclusive of interest and costs, in that plaintiff seeks damages for harm to reputation, emotional distress, restitution, and other consequential damages resulting from Defendants' conduct.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Kansas, and the

injuries suffered by plaintiff were sustained in this District; or alternatively pursuant to 28 U.S.C. § 1391(c)(2).

20. To the extent Defendants' conduct occurred in part outside the State of Kansas, including in the State of New Jersey, such conduct caused injury within this District, and venue is therefore proper under 28 U.S.C. § 1391(b)(2).

21. Defendants are both subject to personal jurisdiction in this Court because, among other things, their tortious conduct described herein targeted a Kansas citizen; and they transact business in the state of Kansas, including the business relationship at issue in this dispute that gave rise to the conduct described herein.

## FACTS

### A. Mr. Koenig and Defendants Agree to Sale of Six Ferraris

22. Mr. Koenig is a long-time collector of exotic cars. In late 2025, he decided to sell seven Ferraris from his collection and used non-parties Joseph Vivolo and Michael Vivolo (together, the "Vivolos") to find potential buyers. The Vivolos identified Defendant Saliba as a possible buyer of all seven Ferraris.

23. On or about December 26, 2025, the Vivolos connected Mr. Koenig with Defendant Saliba via a conference call. On this call, with the help of the Vivolos, Mr. Koenig and Defendant J&S negotiated the sale of Mr. Koenig's seven Ferraris to Defendant J&S.

24. During these negotiations, Defendant J&S asked for a $20,000 discount for all seven Ferraris for "insurance purposes." Mr. Koenig declined, explaining that in his years of collecting exotic cars, it was unusual for a buyer to receive a discount for insurance.

25. With the Vivolos' assistance, Mr. Koenig and Defendant J&S reached a compromise by structuring the sale of Mr. Koenig's seven Ferraris in two parts. First, Mr. Koenig and Defendant J&S agreed to the sale of six of Mr. Koenig's Ferraris to Defendant J&S

for a price that would include a $20,000 discount. It was also agreed on the call that the final terms of the sale of Mr. Koenig's six Ferraris would be subsequently worked out. Second, Mr. Koenig and Defendant J&S agreed to the sale of Mr. Koenig's seventh Ferrari for $300,000, which reflected an increase of $20,000 from Defendant J&S' original offer for the seventh Ferrari. In sum, Mr. Koenig gave Defendant J&S an initial $20,000 discount on the sale price of his six Ferraris in exchange for a $20,000 increase to the sale price of his seventh Ferrari.

26. Later that day, Mr. Koenig finalized the terms of the initial sale of his six Ferraris via a telephone call with Defendant J&S' employee, Matthew Giangrasso. Mr. Giangrasso, on behalf of Defendant J&S, orally agreed to purchase the six Ferraris for a price of $1,230,000, which reflected the $20,000 discount.

27. On or about December 27, 2025, Defendant J&S' employees, including Mr. Giangrasso, visited Mr. Koenig's home in Kansas to inspect the Ferraris. After some discussion, it was determined that Defendant J&S would not proceed with the purchase of the seventh Ferrari. Because the seventh Ferrari was not being purchased, the sale of the six Ferraris would not include a $20,000 discount. Mr. Koenig and Defendant J&S agreed to a purchase price of $1,250,000 for the six Ferraris.

28. On the same day, Mr. Giangrasso, without Mr. Koenig's knowledge or consent, removed two books worth approximately $30,000 each containing provenance documents from two of the Ferraris involved in the six Ferrari sale. Mr. Giangrasso took the provenance documents with him when he traveled back to New Jersey and gave them to Defendants. Had Mr. Giangrasso asked Mr. Koenig if the books containing the provenance documents could be removed from the Ferraris at that time, Mr. Koenig would not have consented because, to

authenticate the cars, it was necessary to keep the cars and books together and Defendant J&S had not yet paid for the cars.

**B. Defendant J&S Underpays for the Six Ferraris and Defendants Record Mr. Koenig without His Knowledge or Consent**

29. Rather than pay the purchase price in a single payment, Defendant J&S made several smaller payments to Mr. Koenig. However, contrary to the terms of the agreement, the total of the payments was $20,000 less than the agreed purchase price for the six cars. In response, Mr. Koenig informed Defendants that he would not release the six Ferraris until Defendant J&S paid him the agreed total purchase price of $1,250,000.

30. On or about December 30, 2025, Mr. Koenig and Defendant Saliba spoke on the phone to resolve their differences over the purchase price. From Mr. Koenig's perspective, the December 30 Phone Call was successful. Defendant Saliba agreed to fulfill Defendant J&S's contractual obligations and pay the additional $20,000.

31. However, for Defendants the December 30 Phone Call served as an opportunity to obtain material to publicize their business by invading Mr. Koenig's privacy. Without Mr. Koenig's knowledge or consent, Defendants recorded the December 30 Phone Call.

32. On or about January 9, 2026, Mr. Koenig was paid in full. Later that day, he released the six Ferraris to Defendant J&S. This should have marked the successful end to the transaction and what was, at most, a short-lived disagreement about the terms of a contract. Unfortunately, Defendants did not choose this path.

**C. Defendants Defame Mr. Koenig and Invade His Privacy by Posting a Video to the Internet Containing Numerous False Statements**

33. On January 21, 2026, just shy of two weeks after Defendant J&S had taken possession of the Ferraris, Defendants posted the Video to the George J. Saliba YouTube channel titled "We Got SCAMMED $1,000,000 By a Ferrari Dealer!? | Day in Life of a LUXURY Car

Dealer”. On the same day, Defendants posted the Video, or parts of the Video, to Facebook, Instagram, LinkedIn, and TikTok.

34. In the Video, Defendant Saliba, using a heavily edited recording of the December 30 Phone Call, made numerous false statements about Mr. Koenig that were humiliating to Mr. Koenig and damaging to his reputation.

35. The sensational title of the Video, “We Got SCAMMED $1,000,000 By a Ferrari Dealer!?” is false. To begin with, Mr. Koenig is not a Ferrari dealer, but a collector of exotic cars. Ferrari takes very seriously who can act as a dealer of its cars. The statement that Mr. Koenig was purportedly holding himself out as a dealer potentially damaged Mr. Koenig’s relationship with Ferrari and put in jeopardy his ability to buy cars from Ferrari.

36. However, given that Mr. Koenig is the only Ferrari “Dealer” featured in the Video, it was clear that the Video was representing that it was Mr. Koenig who purportedly had committed fraud. Moreover, the purported “$1,000,000 scam” presented by the Video concerns the successful effort by Mr. Koenig to obtain $20,000 owed to him by Defendant J&S, not the $1,230,000 that Defendants never disputed that they agreed to pay.

37. The Video also uses excerpts from the December 30 Phone Call to support the claims made by Defendant Saliba in the Video that Mr. Koenig had engaged in extortion to obtain the additional $20,000. The Video was edited to cut Mr. Koenig’s explanation of why he was owed an additional $20,000. By cutting this part of the call, Defendants hid the fact that there was no “scam”—as Mr. Koenig explained, Defendant J&S initially underpaid for the six Ferraris and then Defendant Saliba willingly agreed that Defendant J&S would pay Mr. Koenig the $20,000 Defendant J&S owed to him.

38. Further, the Video falsely states Mr. Koenig was engaged in criminal behavior that is worthy of prosecution. The Video features a phone call between Defendant Saliba and a person who purportedly is Defendants' attorney. On this phone call, Defendant Saliba repeats to the attorney the falsehood that Mr. Koenig improperly withheld the Ferraris after being paid in full and asks the attorney to provide legal advice. In response, the attorney advises to "get the prosecuting attorney involved." Even if there was a legitimate legal dispute between Mr. Koenig and Defendants regarding the correct purchase price for the six Ferraris, which there was not, this conduct would not make Mr. Koenig a criminal subject to prosecution.

39. In addition, the Video falsely portrays Mr. Koenig as a liar. On the December 30 Phone Call, Mr. Koenig voiced his displeasure to Defendant Saliba that Mr. Giangrasso, during the course of inspecting the Ferraris, had taken, without Mr. Koenig's consent, the books for two of the Ferraris containing the provenance documents. The Video includes Mr. Koenig's explanation of the taking of the books, which, during the December 30 Phone Call, neither Defendant Saliba nor Mr. Giangrasso contradict. However, after the call, later in the Video, Mr. Giangrasso falsely claims that Mr. Koenig consented to Mr. Giangrasso taking the books containing the provenance documents and both Defendant Saliba and Mr. Giangrasso act as if Mr. Koenig's position was ridiculous.

40. Finally, in the Video Defendant Saliba repeatedly calls Mr. Koenig "crazy." Defendant Saliba falsely supports these claims by selectively editing the December 30 Phone Call to make Mr. Koenig appear unreasonably angry and emotional. An unedited recording of the December 30 Phone Call would reveal that Mr. Koenig conducted himself with the utmost professionalism.

**D. Defendants Invade Mr. Koenig's Privacy by Using His Voice and Identity Without His Consent**

41. Defendant Saliba creates videos from his life as a used car dealer and posts them to his YouTube pages, titled "George J. Saliba" and "The Saliba Show," to promote himself and Defendant J&S. Together, these YouTube pages have over 800,000 subscribers. Once Defendants post a video on YouTube, they also post the same video, or shorter versions of the video, to various internet sites including Facebook, Instagram, LinkedIn, and TikTok. Together, Defendants have approximately 409,000 followers on Facebook, 486,000 followers on Instagram, 6,000 followers on LinkedIn, and 1,128,000 followers on TikTok. Defendants prominently feature these videos on the J&S website.

42. Not only do these videos serve as an advertisement for Defendants, but they contain third-party advertisements from which Defendants profit from views on YouTube. On information and belief Defendants also receive payment when their videos are viewed on Facebook, Instagram, LinkedIn, and TikTok.

43. As stated above, the Video features an audio recording of Mr. Koenig's voice, which Defendants recorded without his knowledge or consent. Mr. Koenig also has not consented to the use of his voice in the Video.

44. Further, in the Video, Defendant Saliba refers to Mr. Koenig as "Steve," states the name of the town where Mr. Koenig lives, and describes Mr. Koenig as a Ferrari "dealer." The result is that those with whom Mr. Koenig does business, car collectors, and those who live in Mr. Koenig's town, will immediately recognize that it is Mr. Koenig's voice that is used in the Video and Mr. Koenig is the purported "scammer."

### E. Mr. Koenig Discovers the Video and Demands that It Be Taken Down

45. On or about February 6, 2026, Mr. Koenig became aware of the Video. By this time the Video had spread to various websites across the internet and had amassed hundreds of thousands of views on YouTube alone. Moreover, the Video appeared to be particularly popular, amassing far more views on YouTube than Defendants' prior videos.

46. Following his discovery of the video, Mr. Koenig has been horrified by the vitriolic nature of the posted comments. Mr. Koenig, who is Jewish, has feared for his safety after the Video attracted antisemitic comments, and included threatening statements like "I live in Stilwell and if you need any help, let me know."

47. Further, the Video is spreading within the car collector community. For example, the Video has circulated among members of the Ferrari Clubs of both Kansas City and Houston. It is likely the video has been viewed by countless other Ferrari collectors worldwide.

48. On February 13, 2026, Mr. Koenig's counsel sent to Defendants a letter demanding that the Video be taken down.

49. Later that day, Defendants responded, representing that they would take down the Video.

### F. An Edited Version of the Video Continues to Defame Mr. Koenig and Invade His Privacy

50. While the original version of the Video appears to have been taken down from YouTube, an edited version of the Video (the "Edited Video") continues to circulate on the internet. The Edited Video remains on at least YouTube, Instagram, Facebook, LinkedIn, and TikTok.

51. The Edited Video still contains several of the false and defamatory statements included in the original Video. The Edited Video continues to use segments of the December 30

Phone Call to make it appear to the viewer that Mr. Koenig extorted Defendants out of $20,000, which he did not, and falsely depicts Mr. Koenig as a liar with respect to his assertion that Mr. Giangrasso took the books containing the provenance documents without Mr. Koenig's consent.

52. In addition, the vitriol in the comments of the Video are mirrored in the comments to the Edited Video.

53. The Edited Video also continues to invade Mr. Koenig's privacy. The Edited Video, like the original Video, features prominently on Defendants' social media sites and is used to advertise the services of Defendants. Also like the original video, the Edited Video uses the audio of Mr. Koenig's voice from the December 30 Phone Call, which was recorded without Koenig's knowledge or consent and used without his permission. Defendant Saliba also calls Mr. Koenig by his first name in the Edited Video, with the addition that the Edited Video includes text that clearly spells out Mr. Koenig's first name for the viewer.

54. On or about February 14, 2026, Mr. Koenig's counsel demanded that the Edited Video be taken down. As of the date of this complaint, the Edited Video remains on the internet.

55. As a result of having to deal with the Video and Edited Video and the fallout from them, Mr. Koenig has been unable to actively trade his investments, which has resulted in materially lower returns on those days when he did not trade.

56. In the seven days following the posting of the Video, traffic on Mr. Koenig's personal Facebook account increased by 500%, which, on information and belief, is the direct result of the Video.

57. Mr. Koenig has been attempting to sell the seventh Ferrari that Defendant J&S did not purchase. Since the Video, the quotes offered by auction houses seeking to purchase the car have materially declined. On information and belief, this is the direct result of the Video.

**COUNT I**
**Defamation**

58. Mr. Koenig incorporates by reference the allegations of fact set forth in paragraphs 1 through 57 as though fully set forth herein.

59. By posting the Video and the Edited Video to the internet, Defendants (a) communicated to third persons, (b) false and defamatory words, (c) which resulted in harm to the reputation of Mr. Koenig.

60. Specifically, Defendants called Mr. Koenig a "scammer," "crazy," and a liar, and labeled him a criminal with full knowledge that their claims regarding Mr. Koenig were false.

61. Defendants' conduct has harmed Mr. Koenig's reputation by causing those with whom Mr. Koenig does business, other car collectors, and those who live in Mr. Koenig's town to believe Mr. Koenig is a "scammer," "crazy," a liar, and a criminal.

62. As a direct and proximate cause of Defendants' actions, Mr. Koenig has suffered emotional distress including anxiety, humiliation, and fear for his safety. Mr. Koenig has also suffered fiscal damage due to the falsehoods spread by Defendants such as loss of business opportunities and his standing as a respected member of the exotic car collecting community. Mr. Koenig has sustained damages in excess of $75,000.

63. The continued availability of the Video and Edited Video to the public will cause incalculable damage to Mr. Koenig in the future, because he will never know who would have done business with him but has not because of the Video and Edited Video. The only remedy for this is for the Video and Edited Video to be removed and for Defendants to be barred from posting videos with similar false accusations.

**COUNT II**
**Invasion of Privacy by Appropriation of Name or Likeness**

64. Mr. Koenig incorporates by reference the allegations of fact set forth in paragraphs 1 through 57 as though fully set forth herein.

65. Defendants have invaded Mr. Koenig's privacy by (a) using his voice and identity, (b) for their own commercial benefit), (c) without Mr. Koenig's consent.

66. As a direct and proximate cause of Defendants' actions, Mr. Koenig has suffered emotional distress including anxiety, humiliation, and fear for his safety.

67. As a direct and proximate cause of Defendants' actions, Mr. Koenig has also suffered financial damage due to the falsehoods spread by Defendants, such as his lost business opportunities and his standing as a respected member of his communities, including the town in which he resides and the exotic car collecting community, among others. Mr. Koenig has sustained damages in excess of $75,000.

68. The continued availability of the Video and Edited Video to the public will continue to cause incalculable damage to Mr. Koenig's future business opportunities, while Defendants continue to earn advertising revenue from the Video and Edited Video. While Mr. Koenig seeks to recover restitution for the payments Defendants have received in connection with the Video and Edited Video, the only remedy for the harm suffered by Mr. Koenig is for the Video and Edited Video to be removed and Defendants barred from posting videos with similar false accusations.

**COUNT III**
**False Light Invasion of Privacy**

69. Mr. Koenig incorporates by reference the allegations of fact set forth in paragraphs 1 through 57 as though fully set forth herein.

70. By publishing the Video and Edited Video to the internet, Defendants have (a) published for third persons, (b) the Video and Edited Video which falsely represent that Mr. Koenig is a "scammer," "crazy," a liar, and a criminal, and (c) that representation would be highly offensive to a reasonable person.

71. Defendants called Mr. Koenig a "scammer," "crazy," and a liar, and they labeled him a criminal with full knowledge that their claims and representations regarding Mr. Koenig were false.

72. As a direct and proximate cause of Defendants' actions, Mr. Koenig has suffered emotional distress including anxiety, humiliation, and fear for his safety. Mr. Koenig has also suffered fiscal damage due to the falsehoods spread by Defendants such as loss of business opportunities and his standing as a respected member of the exotic car collecting community. Mr. Koenig has sustained damages in excess of $75,000.

73. The continued availability of the Video and Edited Video to the public will cause incalculable damage to Mr. Koenig in the future, because he will never know who would have done business with him but has not because of the Video and Edited Video. The only remedy for this is for the Video, Edited Video to be removed and Defendants barred from posting videos with similar false accusations.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Koenig prays that this Court grant the following relief:

a. For an injunction requiring the removal from the internet and all social media accounts owned, operated, or managed by Defendants or their affiliates of the Video, the Edited Video, and any other video posted, shared, or disseminated by Defendants suggesting the Mr. Koenig is a liar, scammer, or a criminal;

b. For injunctive relief against the use of Mr. Koenig's voice, image, likeness, identify, or name by Defendants;

c. For general damages, special damages, punitive damages, and damages of any kind not yet ascertained in an amount to be shown according to proof at trial, but in excess of $75,000;

d. For costs of this action and reasonable attorney's fees;

e. And any other relief as the Court may deem proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues raised herein.

**DESIGNATION OF PLACE OF TRIAL**

Plaintiff hereby requests that the trial of this cause be held in Kansas City, Kansas.

DATED: March 19, 2026

Respectfully submitted,

STINSON LLP

By: */s/ Christopher B. Sevedge*
Christopher B. Sevedge, Kan. #27714
Sarah C. Schmitz, Kan. #30127
chris.sevedge@stinson.com
sarah.schmitz@stinson.com
1201 Walnut Street, Suite 2900
Kansas City, MO 64106-2150
Telephone: 816.842.8600
Facsimile: 816.691.3495

and

PILLSBURY WINTHROP SHAW PITTMAN LLP

David G. Keyko
david.keyko@pillsburylaw.com
31 West 52nd Street
New York, New York 10019-6131
Telephone: 212.858.1000
Facsimile: 212.858.1500
Admitted Pro Hac Vice

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of March, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record in the above-referenced matter.

*/s/ Christopher B. Sevedge*
Attorney for Plaintiff